May it please the Court, I am Robert Job and I am appearing today on behalf of the petitioner Usha Bhasin. It seems to me that this is precisely the kind of case that Congress had in mind when it amended the INA to allow aliens and removal proceedings to seek to reopen proceedings on the basis of new facts. In 1999, when the IJ denied Ms. Bhasin's applications, there was some, albeit limited, evidence to suggest that Ms. Bhasin might be able to safely return to India. Although the JKLF had kidnapped Ms. Bhasin, held her for four days, severely beaten her, had disappeared her two sons, and had threatened to eliminate the rest of her family, Ms. Bhasin's two daughters, brother, son-in-law, were all in India and had not been harmed. By the time the Board denied her appeal, however, in April 2003, the situation in the family had changed dramatically. In February of 2001, Ms. Bhasin's brother died and Ms. Bhasin's younger daughter moved to Marut in the state of Uttar Pradesh to live with Ms. Bhasin's older daughter, Indu, and her husband, Rajiv. Thereafter, Ms. Bhasin says that she spoke with Indu, quote, frequently and she learned that she and her husband were receiving threats. Blank letters spotted in blood, clothing soaked in blood left on their front step. Stones wrapped in paper saying things like Kashmiris and Muslims don't leave any enemy in this world. And then finally, a phone call from someone who said, quote, your brothers are missing and very soon everyone in your family will disappear. Then in October of 2002, Ms. Bhasin lost all contact with her children. For more than six months, she unsuccessfully called India trying to reach her children until finally their phone was disconnected. By the time she filed her motion to reopen in July of 2003, her children had been missing for some eight to nine months. To dismiss this new information as self-serving and not highly probative as the Board did, it's just crazy. Both the immigration judge and the Board credited Ms. Bhasin's testimony that the JKLF had, quote, threatened to eliminate each member of her family, unquote, and had, in fact, disappeared her two sons. The evidence presented with Ms. Bhasin's motion to reopen would convince any reasonable fact finder that the JKLF had located her daughters, directly threatened to make them, quote, disappear, unquote, and that the two daughters and Ms. Bhasin's son-in-law were now missing. How could that not be probative? Incredibly, the government says that it's pure speculation to suggest that the threats received by Ms. Bhasin's daughters came from the JKLF. That, however, is simply disingenuous. First, at her hearing, Ms. Bhasin testified that, quote, the only organization, unquote, that was harassing her family was the JKLF. That's at page 161 of the administrative record. Second, the JKLF is a Kashmiri Muslim organization. It's in the country profile on page 211. It essentially left its calling card when it tossed a stone at the home of Ms. Bhasin's daughters with a piece of paper that said, quote, Kashmiris and Muslims don't leave any enemy in this world, unquote. And when they called into Ms. Bhasin's daughter and told her, quote, your brothers are missing, and very soon everyone in your family will disappear, unquote. See, that latter threat is nearly identical to the written threat that Ms. Bhasin received when she was in Delhi in November of 1997, when the JKLF told her, we have abducted both of your sons, and one by one we are going to eliminate your family. We are not going to spare anyone. The similarities are not coincidental. On these facts, any reasonable person would be compelled to conclude that the individuals that were threatening Ms. Bhasin's daughters were linked to the JKLF members who had threatened Ms. Bhasin and who had disappeared her two sons. Now turning to the issue of the discretionary denial, on July 25th the government filed an opposition to our motion to reopen, and they argued for the first time that Ms. Bhasin had failed to appear in response to a valid order that she report for removal, and they argued that her motion to reopen should therefore be denied in the exercise of discretion. We never saw that request. We didn't see that request until we received the administrative record from this Court. And the reasons for that are two. I mean, first, although I had filed a notice of appearance with the Board on July 16th, 2003, the government didn't serve me with their response and their invitation to have this case dismissed. They instead attempted to serve Ms. Bhasin. Now my notice of appearance is in the record at pages 25 and 26, but the government's proof of service on page 19 of the record makes clear that they didn't send me this document. Instead, the proof of service indicates they sent it directly to Ms. Bhasin. But even that attempt was futile because they sent it to a wrong address. Ms. Bhasin testified repeatedly. This is on page 137 of the administrative record, and this address is also littered throughout the record in various documents, but she testified that she lived at 1489 Fruitvale. But the government mailed its motion to 1498 Fruitvale. That's on their proof of service on page 19 of the administrative record. As a result, they didn't mail it to me. They mailed it to her, but they sent it to a wrong address. We never even heard that the government was asking the Board to dismiss our motion based on the fact that she had failed to report for deportation. Now, if we'd known that the government was making such a request and we'd had an opportunity to respond, we would have told the Board that, in this particular case, a number of things. First off, we would have told the Board that it can't dismiss or deny Ms. Bhasin's motion insofar as it's requesting withholding of deportation because the Board has no discretion to deny withholding of deportation once a prima facie case is established. Secondly, we would have told the Board that, in this particular case, there is no valid deportation order that has been entered against Ms. Bhasin. And this goes to the fact that Ms. Bhasin's attorney, Manpreet Gara, entered an appearance at the Board, and on his notice of appearance form, he indicated, and this is on page 116 of the administrative record, he indicated that his address for purposes of this proceeding was 2131 Blake Street, number 9 in Berkeley, California. And if you go through the record, you will find no fewer than 20 references to that address in this record. But when the Board rendered its decision, it didn't send its decision to Manpreet Gara on Blake Street. It picked a completely different address on Samson Street and mailed the decision to that address. And as a result, we didn't know that the Board had denied her asylum claim until the period for appealing to this Court had passed. Now, the government says, well, there's a valid order of deportation, you know, she should have appeared and, you know, taken her chances, perhaps been taken into custody, perhaps been removed. But I submit that there can't be a valid order of deportation unless we're given a fair opportunity to bring that decision before this Court and contest it. But we weren't given that opportunity because the Board mailed its decision to an incorrect address. We didn't know about the Board's decision denying this case on the merits until the 30 days for appealing to this Court had passed. We didn't have any opportunity to You can't consider that a valid order of deportation. Now, the government may come in and say, well, maybe there's some evidence somewhere. It's not in this administrative record that Manpreet Gara moved to some other address. But it's, like I say, it's not reflected in this record. And if you go back and you look at the Board's procedures manual, which is posted on their website, it makes clear that there's a process for attorneys who change their address. And the process is that in each and every case in which that attorney is listed as counsel, the attorney has to submit a new Notice of Appearance form listing that person's new address. But there's no new Notice of Appearance in this case for Mr. Gara. The only Notice of Appearance, the only address he ever used was the Blake Street address. And instead of mailing the decision to that address, the Board mailed the decision to a completely different address on Sansom Street. And as a result, we would submit there is simply no valid order of deportation. And you can't treat this woman as a fugitive from justice. And it was inappropriate for the Board to deny her motion in the exercise of discretion. I'll reserve the balance of my time unless there are questions. I don't see any. Thank you, Mr. Jobe. Counsel? Mr. Lawrence? Good morning, Your Honor. May it please the Court, my name is Victor Lawrence and I represent the Attorney General. This Court should deny this petition for review. This petitioner submitted a motion to reopen on the day before her order of deportation from this country after receiving a final order of removal. The motion to reopen did not show new facts that were material that could not have been presented at the prior hearing. And therefore, this petitioner did not meet her heavy burden for a motion to reopen. I don't quite understand that, Counsel. Didn't all these facts about the daughters and the disappearance happen after the hearing? Your Honor, the issues that the petitioner raised regarding her daughter and her son happened after the 1999 immigration hearing, but before the order from the Board, which dismissed the appeal of the immigration judge's decision. Had the petitioner wanted to bring these facts, and I'm not prepared to actually call them facts because I believe that they were really rife with speculation, for the petitioner to say, for instance, that the of threats of the J.K.L.F. is pure speculation. There's nothing in the record to support that. If she had said that on the stand at the immigration hearing, it would have been accepted as fact, right? No, sir, Your Honor. Is there a finding of lack of credibility that I missed here? It's not a credibility issue. It's a question of, you know – I'm going to repeat my question, and it's a hypothetical question related to this case. If she had took the stand under oath and said, my brother died on X date of a heart attack caused by the stress of these events, in the absence of an adverse credibility finding, that would be accepted as fact, right? Well, Your Honor, I would dispute – Can we start with a yes or a no? Sure. What's the answer to my question? No, there's no presumption of credibility based on – in the absence of an adverse credibility finding. For the purpose of the law of this circuit, if what I had just described to you had happened, our court would accept that as fact. Isn't that correct? There are decisions that seem to suggest – Can I have a yes or a no to that? Well, I'd qualify the answer no, but there are decisions that seem to suggest – and I'm not trying to parse words, Your Honor – but there seem to suggest that in the absence of a credibility finding, facts should be considered as credible, but there's no presumption of credibility. The law is absolutely clear. In the absence of an express adverse credibility finding, the Petitioner's testimony is taken as true, right? Unless that law's changed since I walked in here this morning. Well, what maybe you're trying to say to us is that the fact of death would be accepted, but the cause would perhaps be speculative? Yes, Your Honor. Certainly, that would be the case. If she had testified at the hearing that her brother died in February 2001, yes, that might be accepted as true in the absence of an adverse credibility finding, but her speculation is something else entirely. But, counsel, in this case, I think it's quite telling that her whole family is now gone, disappeared, dead. Is that not correct? It is not correct, Your Honor. I believe that the basis of fact is a lot of speculation. There's no proof that her daughters are dead, just that she hasn't heard from them. But, counsel, she has continuing, ongoing contact with her family and her daughters, and she's made valiant attempts to find them. The neighbors say that they disappeared on a certain date. It's rather hard for me to think that it's now speculation that they're still alive and well, but don't want to call their mom. All of the incidents that she describes in her declaration are untested before the immigration judge. She was not cross-examined over those issues. So to answer Your Honor's question, we don't know whether or not she would have been considered credible with respect to these other issues regarding her family that came after the decision of the immigration judge. Well, there's a way to find out. Reopen. Well, but, Your Honor, in order to do so, there's a heavy burden that you have to meet, and we submit that that has not been done here. Well, what more could she do? Well, in order to present new evidence, you have to show that you're going to be able to prove these facts. That's what the regulation says. She's certainly going to be able to prove that the telephone's been disconnected. She's tried repeatedly to call her family. There were all of these incidents of threats and almost physical threats, like rocks and bloody rags. What more can she tell us that makes you not believe this? Well, to turn that around, Your Honor, the standard here is to see whether or not the Board's decision was arbitrary, irrational, or contrary to law. Yeah, I kind of like this. The Board listened to these same facts, and they found that this wasn't enough to meet the heavy burden. So, basically the case is that she hasn't heard that she, first of all, had regular contact with her daughters and then has not been able to reach them for a period of time, and the Board calls that speculation. How can that possibly be speculation? You might say it's not true, the government wants to cross-examine, there's some evidence that would contradict it, but when the person says, under oath, I have a long history of contact with my daughters and I've lost contact with them, just stop it right with those two things, how can the Board say that's pure speculation? Well, first of all, I don't think the Board used the words pure speculation with respect to that, but they just said that she hadn't met the heavy burden with respect to reopening. But it is pure speculation, if I may, Your Honor, for her to take that absence of contact after a long period of time and declare that the reason now for the absence of contact is related to this threat from years ago from the JKLF, that part is pure speculation. Now, you can certainly argue, as Mr. Jobe did, that there can be an inference given the fact that there were threats from the JKLF before, but to absolutely connect the two is speculation. And there's a heavy burden to meet with respect to motions to reopen. And the Board did not act arbitrarily, did not act irrationally, and did not act contrary to law when it determined that this particular petitioner did not meet that burden. And in addition, based on the discretionary finding, particularly when it realized that here's this person who had a final order of removal for a date certain, and the day before she files a motion to reopen and ignores the removal order, she became a fugitive from justice. By the fugitive disentitlement doctrine that this Court has accepted, this Court should bar relief on that alone. Well, how do you answer Mr. Jobe's recital of the facts of mismailing from the agency? They never sent anything to the right address or to the right people. I was very intrigued by that because Mr. Jobe, I believe, made some arguments this morning that were not made in his briefs. Certainly in his briefs, he made the statements that things were mismailed. I don't believe his briefs state that things were not received. They were mismailed to different addresses. Today, he's saying they weren't received and they would have taken all sorts of different measures, and he's also suggesting for the first time this morning that that final order of removal is invalid for some reason because it wasn't received at a certain time and they should be able to challenge that. That argument was never made before, and he's failed to exhaust his administrative remedies on that. And this Court should ignore that argument. So I would suggest to you that with respect to all the mismailings that Mr. Jobe has pointed out, that there's a different issue between whether things were mismailed and whether things were actually received. And I didn't see the argument in the briefs, and I may be corrected, but I didn't see the arguments in the briefs to suggest that these things were not received. How about the failure to mail to Mr. Jobe? Well, I think that the if I recall correctly, the one thing that was failed to be mailed to Mr. Jobe was like two weeks after he submitted his paperwork showing that he was counsel. So it's easily explainable when you have an agency in Falls Church, Virginia, the EOIR, and Mr. Jobe mails his address in and that agency is mailing things out. The two hadn't connected yet within that two-week period of time for him to. The fact is he didn't get the notice. I mean, I'm not sure I heard that, though. But Ms. Bossing, the Petitioner herself, an address, a copy of that was mailed to her. And although he suggested that that was the wrong address. He says it's the wrong address. Right. But I didn't. Is that right? Was the address it was mailed to different from the address she had told the agency she lived at? I believe the address was different, but there's no argument that it wasn't received by Ms. Bossing. And that raises a big specter in my mind. Why wasn't that said? Doesn't the presumption under the law arise when there's a proper mailing to a proper address? The presumption arises when there's a regulatory presumption that if something was sent to the correct address, it was received. But there's not a regulatory presumption that says if something was mailed to the incorrect address, that it was not received. That's a rather interesting statement, counsel. I think it's true. I think it's true. You can mail it to the wrong address and as long as somebody doesn't say anything, that's okay. Well, it's not like something was mailed to Pennsylvania that should have been mailed to California. We're only talking about a couple of different digits on the same street. So the idea that a postman sees that something should be, and I don't remember the exact numbers, should be sent to 1908 Farmsdale Road and it ends up being sent and the actual address is 1924 Farmsdale Road and the person has an unusual last name like Bossing, B-H-A-S-I-N. It stands to reason that there's a pretty good chance that that mail is actually going to end up at the right address. You know, there's an old saying, that's good enough for government work. But you're over your time. You want to wind up quickly? Sure. I would suggest that the petitioner has not met their heavy burden on the motion to reopen and the Fugitive Disentitlement Doctrine should bar Ms. Bossing from relief in this case. They filed a motion to reopen on the day before she was ordered to be removed from the country. She ignored that. She's a fugitive from justice. And under the clear case law of this court, this court should bar relief to Ms. Bossing. Counsel, this is on our time, but was there any cross-examination by the government in the original hearing or on the motion to reopen? Any cross-examination at all? You say it rested upon pure speculation, but doesn't the government have more of a burden than to go off on a hunch? Was there cross-examination? Well, no, Your Honor, because the motion to reopen, there was no hearing on the motion. Okay, I realize, but in the original hearing on the asylum, was there cross-examination? Sure, but all these issues that were raised in the motion to reopen were new issues that weren't addressed at the immigration hearing. I understand that argument. So in a motion to reopen, which is like a motion for a new trial, you have to show facts that would be proven. If you got a new trial, you'd have to show facts that would be proven. And here, she's only- You're enlarging your answer to my question. Okay. I wanted to know if there was cross-examination by the government. Did the government put on any proof whatsoever in the original asylum hearing? At the original asylum hearing, yes, the government did put on- What kind of evidence? Well, I mean, I think the majority of the evidence was through cross-examination of the petitioner. So it wasn't like direct evidence of direct cross-examination of other witnesses or anything. Going back to Judge Hawkins' question, there was no finding here that the petitioner was not credible. There's no finding that the petitioner was not credible at her asylum hearing, but there's no finding, there's no presumption that she's credible with respect to anything that she brings up in a motion to reopen. That has not been tested. I think I understand your argument well over your time. Okay. I apologize, Your Honor. I was just trying to respond. Thank you. Mr. Jobe. Just very briefly. The government says that we've failed to exhaust our administrative remedies in arguing that there was no valid removal order entered against Ms. Bazine. But that's exactly the point, is that we never had an opportunity to make these arguments because the government's invitation to have this case dismissed wasn't properly served on me. Now, the government says, well, you know, this is coming from Falls Church. That's absolutely not true. The government's motion was going to Falls Church and it was supposed to be served on me. I'm in the same building as the Immigration and Naturalization Service. They're right upstairs from me. I didn't, they didn't serve me with the document and it didn't get to me because they mail it to Ms. Bazine and they mail it to an incorrect address. And there's no dispute about that. The administrative record makes this absolutely clear that she lived at 1489 Fruitvale and they sent their document to 1498. We never knew about this until we got the administrative record. And for the government to say we didn't exhaust administrative remedies, again, that's just disingenuous. Okay. Thank both counsel for their arguments. The case just argued will be submitted for decision. We'll proceed to the third case on the docket, which is Ochoa versus Gonzalez. And I believe we have Mr. McLaughlin back. Yes.
judges: Lay , B. Fletcher, Hawkins